**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re:                                              :
                                                    :
HAIMIL REALTY CORP.,                                :         Chapter 11
                                                    :
                              Debtor.               :         Case No. 14-11779 (MEW)
-----------------------------------------------------------------x
DOMINION FINANCIAL CORPORATION,                     :
                                                    :
                              Plaintiff,            :
                                                    :
         -against-                                  :         Adv. Proc. No. 14-02052 (MEW)
                                                    :
HAIMIL REALTY CORP., et al.,                        :
                                                    :
                              Defendants.           :
-----------------------------------------------------------------x

<u>**MEMORANDUM OPINION**</u>

APPEARANCES:

Allan B. Mendelsohn, Esq.
ALLAN B. MENDELSOHN, LLP
Huntington, NY
  *Attorney for Dominion Financial Corporation*

Douglas Pick, Esq.
Eric C. Zabicki, Esq.
PICK & ZABICKI LLP
New York, NY
  *Attorneys for Debtor Haimil Realty Corp.*

Glenn Backer, Esq.
New York, NY
  *Special Counsel to Debtor Haimil Realty Corp.*

**MICHAEL E. WILES**
**United States Bankruptcy Judge**

        Debtor Haimil Realty Corp. borrowed money from Dominion Financial Corporation to

fund the renovation of a building and a condominium conversion.  Haimil removed Dominion's

state court foreclosure action to this Court after Haimil filed its bankruptcy petition, and

Dominion has filed a proof of claim in Haimil's case.  The Court consolidated proceedings with

respect to the foreclosure case and the proof of claim and held a trial on September 18 and 21,

2015 to determine whether any debts are outstanding and, if so, whether they are secured or

unsecured.  The Court holds that Haimil owes $2,608,526.05 to Dominion as of February 16,

2016 (representing unpaid principal of $1,225,427.21 and accrued but unpaid interest of

$1,383,098.84) and that the outstanding debts are secured by a mortgage lien on the Property (as

defined below) to the extent of the value of the Property.  The parties are directed to appear at a

conference on March 1, 2016 at 10:00 a.m. to discuss the further relief (if any) that should be

incorporated into a judgment in the foreclosure case.

## Jurisdiction and Power to Issue a Final Decision

The Court has jurisdiction under 28 U.S.C. §§ 157(c) and 1334(b) and has core

jurisdiction over Dominion's proof of claim.  The parties have expressly consented to a final

decision by this Court.  *See Wellness Int'l Network, Ltd. v. Sharif,* 135 S. Ct. 1932 (2015).

## Decisions as to the Parties' Disputes

The parties agree that Haimil borrowed money from Dominion.  They also agree that

some monies were borrowed under a secured note executed in 2004 and that other monies were

borrowed, at later times, on an unsecured basis.  However, the parties disagree as to the terms of

the loans, the dates and amounts of principal advances, the dates and amounts of advances made

to pay real estate taxes, the interest accruals, the ways that prior repayments should be applied,

the amounts (if any) that remain unpaid, and whether any unpaid sums represent secured or

unsecured debts.

## I.    <u>The 2004 Note</u>

On December 22, 2004 Haimil executed a promissory note in favor of Dominion in the stated amount of $3.4 million (the "**2004 Note**").  The 2004 Note consolidated and replaced two other notes.  The 2004 Note was secured by a mortgage (the "**2004 Mortgage**") on the building owned by Haimil at 209 East 2nd Street in New York City (the "**Property**").  Haimil did not dispute the existence, filing and perfection of the 2004 Mortgage.

Some terms of the 2004 Note and the 2004 Mortgage are straightforward and undisputed. Each states that interest will accrue at the rate of 12% on a 360-day year basis; the 2004 Mortgage adds that the calculation of accrued interest will be based on actual days elapsed.  The stated maturity date was December 31, 2005.

Some rights under the 2004 Note and 2004 Mortgage, though clearly set forth in the documents, have been waived by Dominion:

- Payments made more than ten days after they are due give rise to a late payment fee equal to 6% of the late payment (*see, e.g.,* 2004 Mortgage ¶, 24), but Dominion has made no claim for such late fees.

- The 2004 Note calls for the payment of an "exit fee" of $36,000 upon repayment, but Dominion has made no claim for that fee.

- The 2004 Note provides for the payment of "Additional Interest" tied to the net proceeds of condominium sales, but Dominion has waived any claim for Additional Interest.  *See* Joint Pretrial Order [ECF No. 42], § III(A)(4).

Other terms of the 2004 Note and 2004 Mortgage raise issues that must be addressed in resolving the disputes between the parties.

A.      **Interest on Funds Held in Reserve**

The parties agreed that $1,966,994.69 was disbursed from the proceeds of the 2004 Note

at the initial closing to repay other debts and to cover certain charges.  *See* Trial Exs. E, OO, 35.

The 2004 Note stated that the balance of the $3.4 million would be held in reserve:

> $1,433,005.31 of such amount shall be held back and released pursuant to a
> mutually agreed schedule against work actually done and required to obtain a
> CO for the building, for "soft costs" associated with such work, ***for the costs
> of paying interest on this Note and carrying the property***, and for the costs
> associated with a condominium conversion.

Trial Ex. C (emphasis added).  The parties therefore expressly agreed that the reserved funds

would be used to cover interest payments as well as other advances and charges.

Haimil contends that interest should only have accrued on sums that had actually been

paid out from time to time under the 2004 Note, and not on the reserved funds.  Dominion

contends that the entire balance was outstanding from and after the initial closing (even though

some amount was held in reserve), and that interest accrued on the entire $3.4 million stated

amount.  In other words, Dominion treated the "reserve" as having been borrowed by Haimil and

funded by Dominion, even though Dominion continued to hold the reserved funds.

In this regard, the first sentence of the 2004 Note refers to the repayment of "the sum of

$3.4 million" plus interest.  The parties could have agreed that interest would accrue only on

amounts actually advanced (and they did so agree in a later note, as described below), but they

did not do so with regard to the 2004 Note.

In addition, the breakdown of the disbursements at the initial closing includes a

calculation of the interest due from the closing through year-end.  The relevant item states that it

represents "Interest on $3,400,000" for the period from December 22, 2004 through December

31, 2005, in the amount of $11,333.33.  *See* Trial Ex. E.  It was plain, at the initial closing, that a

portion of the $3.4 million principal amount of the 2004 Note would be held in reserve, but the

4

parties nevertheless calculated the partial interest payment for December 2004 based on the entire $3.4 million face amount of the 2004 Note. The calculation shows that the parties understood that interest was accruing with respect to the full $3.4 million stated amount of the 2004 Note, including amounts held in reserve.

The 2004 Note also provided that monthly payments would be made in the amount of $34,472.22. As described in Part I(B), below, this figure corresponds to a monthly interest accrual on the full $3.4 million face amount of the 2004 Note, using the interest rate of 12% and the "actual/360" day count convention. The monthly payment is further verification that the parties intended for interest to accrue on the entire $3.4 million figure, including the reserve.

Dominion also presented evidence showing that it accrued interest on the entire $3.4 million principal amount each month and that it issued checks, from the reserve, purporting to make those interest payments, though as explained below Dominion's calculations of the amounts due each month suffered from some errors. Haimil offered no testimony suggesting that it had a different understanding and offered no evidence in support of its contention that interest should not accrue on the funds held in reserve. In essence, Haimil asked the Court to hold that interest accrued only on amounts that had actually been released, without any evidence that the parties had so agreed or any legal argument suggesting that the law requires that result.

The Court finds based on the evidence that the parties contemplated, and agreed under the express terms of the 2004 Note, that interest would accrue on the entire $3.4 million stated amount of the 2004 Note, including the reserve.

**B.    <u>Interest Accruals</u>**

The 2004 Note states that Haimil shall make monthly payments "of interest only" in the amount of $34,472.22 per month from February 1, 2005 through December 31, 2005, with all

remaining sums due thereafter.  *See* Trial Ex. C.  In the 2004 Mortgage, however, the agreed

monthly payments were inserted in a portion of a printed form that relates to principal payments.

*Id.*  The resulting text reads as follows:

> THAT the time of payment of the stated ***principal*** sum secured by the above
> described notes, bonds or obligations, as modified by this agreement, is
> hereby extended so that ***the same*** shall be due and payable in equal monthly
> installments of ($34,472.22) Dollars commencing on the 1st day of February
> in the year 2005, and commencing thereafter on the 1st day of each and every
> month until the 31st day of December, 2005, at which time the then entire
> unpaid balance of principal and interest then due and owing under this
> agreement shall be due and payable, such payments to be applied first to the
> payment of interest and then to the payment of principal, together with
> Additional Interest as provided in the Note.
>
> PROVIDED, that the party of the second part, meanwhile pay interest on the
> amount due and owing on the above described notes, bonds or obligations
> from the __ day of December, in the year 2004, at the rate of twelve (12%)
> per centum per annum, on the 1st day of February in the year 2005, next
> ensuing and monthly thereafter, until the 31st day of December, in the year
> 2005 . . .

*Id.* (Emphasis added).  The 2004 Mortgage also states that its provisions regarding principal and

interest shall prevail over inconsistent statements in the 2004 Note.  *See* 2004 Mortgage ¶, 18.

Neither party addressed this inconsistency between the 2004 Note and the 2004 Mortgage

at trial.  In addition, neither party offered any explanation of how the $34,472.22 monthly

payment figure had been calculated.  However, the Court has been able to "reverse engineer" the

figure based on the terms of the 2004 Note and the 2004 Mortgage.  Although the 2004 Note

calls for the accrual of interest at a simple interest rate of 12% per annum (which suggests a

monthly interest payment of $34,000), the 2004 Note and the 2004 Mortgage also state that

interest is to be calculated on a 360-day year basis, and the 2004 Mortgage states that the actual

interest accrual is to be based on the actual number of days elapsed.  The use of this "actual/360"

day-count convention effectively means that the real rate of interest per calendar year is slightly

higher than the stated rate of 12%.  This is because: (a) the 12% rate is calculated on the

assumption that there are only 360 days in the year, but (b) interest is actually paid by the

borrower for 365 days (or 366 days during a leap year).  *See Kreisler & Kreisler, LLC v. Nat'l*

*City Bank*, 657 F.3d 729, 731–32 (8th Cir. 2011); *Voitier v. First Nat'l Bank of Commerce*, 514

F. Supp. 585, 587 (E.D. La. 1981).  As a result, the actual interest payment for a 365 day

calendar year under the 2004 Note would be calculated as follows:

$$(Principal) * (stated\ interest\ rate) * (365/360)$$

In this case, that amount would be:

$$(\$3,400,000) * (.12) * (365/360) = \$413,666.67$$

Spreading out the $413,666.67 interest accrual evenly over twelve months produces a monthly

payment of $34,472.22, which is the amount specified in the 2004 Note and the 2004 Mortgage.

It is plain that the monthly payment represented interest only (as stated in the 2004 Note),

notwithstanding the incorrect placement of the figure in the "principal" payment paragraph on

the printed form that the parties used for the 2004 Mortgage.  The parties agreed at trial that they

never contemplated monthly payments of principal, and given their agreement the Court will

treat the language in the 2004 Mortgage as an error that is subject to reformation.  *See Harris v.*

*Uhlendorf*, 248 N.E.2d 892, 894 (N.Y. 1969) (reformation is applicable "where the parties have a

real and existing agreement on particular terms and subsequently find themselves signatories to a

writing which does not accurately reflect that agreement").

Although the 2004 Note requires a monthly interest payment of $34,472.22, Dominion

did not use that figure in its records.  Instead, Dominion accrued interest on its books in the

amount of $35,908.56 per month.  Dominion's representative testified that this was an error

based on the use of a 12.5% interest rate, and Dominion proposed to correct for the error by

making a one-time reduction to the accrued balance in the amount of $78,869.91.  However, no

explanation was offered as to the $78,879.91 calculation and whether it would actually correct, in full, for the errors in Dominion's interest calculations. Instead of using the Dominion figures the Court will recalculate the interest. The Court will accrue interest using the monthly interest payment ($34,472.22) through the stated maturity of the 2004 Note (as the parties agreed), and will accrue interest from and after January 1, 2006 using the actual/360 day count convention.

As noted above, interest payments and other amounts were funded from a reserve; accordingly, the Court will treat the monthly interest payments on the 2004 Note as having been funded by the reserve until such time as the reserve was exhausted. Further issues relating to interest accruals on the 2004 Note after the reserve was exhausted (*i.e.,* whether they were secured charges that continued to accrue under the 2004 Note or whether they instead were funded by additional unsecured loans) are discussed in Part II(D), below.

### C.    Advances to Pay Real Estate Taxes

At the Court's direction the parties submitted summaries showing how they believed the debts had accrued and/or been repaid over time, using a format that the Court directed them to use. *See* Trial Exs. OO, 35. Dominion's summary treats real estate tax payments as principal advances under the 2004 Note until such time as the reserved amounts were used up, and as amounts funded through unsecured loans at later times. Haimil's summary treats all of the real estate tax advances as unsecured debts.

Based on the evidence at trial the Court finds that the parties intended, and that the agreements provide, that real estate tax payments would be treated as having been funded by the agreed reserve during periods when the reserve was in effect. The 2004 Note plainly contemplated that the reserve would be used to cover the costs of "carrying" the property, and Dominion's treatment of real estate taxes as carrying costs is consistent with the normal use of

8

that term.  *See, e.g.,* 3-32 Warren's Weed New York Real Property § 32.110[8] (including taxes

in the list of items that normally make up carrying costs).  The treatment of real estate tax

payments that were made after the reserve was exhausted (*i.e.*, whether they constituted

additional secured charges that accrued under the 2004 Note and 2004 Mortgage and that bore

interest at 2% per month, or whether they were instead funded through separate unsecured loans

at a different rate of interest) is discussed in Part II(F), below.

      **D.**    <u>**Default Interest**</u>

      Haimil's calculations do not provide for the accrual of any interest at "default" rates.

Dominion's calculations treated outstanding amounts as having accrued interest at default rates

from and after August 9, 2012, though Dominion argued in its post-trial submissions that default

interest should accrue from and after April 28, 2010.  At trial, Dominion's principal (Mr.

Rinzler) testified that he believed that Dominion's summary accrued default interest from the

date of Dominion's state court foreclosure case, though he was uncertain whether the date of an

earlier legal demand might have been used in preparing the summary.

      To the extent that amounts were still outstanding under the 2004 Note on the date that

Dominion filed the foreclosure case, the 2004 Note and the 2004 Mortgage support Dominion's

position.  Paragraph 25 of the 2004 Mortgage states:

> In the event that foreclosure proceedings are instituted, a suit commenced or
> any action taken with respect to said note and this mortgage, or a default is
> made in making the final payment of said note, the interest rate to be charged
> shall be two (2%) per month on the balance due.

The 2004 Note is even more broadly worded.  It provides that in the event of "any" default the

note will bear interest from the time of such default "at the rate of two (2%) per cent per month."

It further states that default interest will accrue "without the necessity of [Dominion] making any

demand or giving any notice of default, whether written or oral . . ."

The language of the 2004 Note and the 2004 Mortgage plainly provide for the accrual of default interest from and after the date of a foreclosure action or the filing of any other suit to collect the debt.  They do not require any other notice of default or demand to be made as a prerequisite to such default interest.  The default rate to which the parties agreed (24%) is high, but New York courts have enforced agreements that provide for similar default rates.  *See, e.g., Jamaica Savings Bank FSB v. Ascot Owners, Inc.,* 665 N.Y.S.2d 858 (1st Dep't. 1997) (enforcing agreement to 2% per month default interest rate and denying discovery as to the negotiation of the same); *Bloom v. Trepmal Const. Corp.,* 289 N.Y.S.2d 447 (2d Dep't. 1968) (holding that 2% per month default interest was a valid and enforceable provision); *Emigrant Funding Corp. v. 7021 LLC,* 901 N.Y.S.2d 906 (Sup. Ct. 2009) (enforcing 24% default interest rate and overruling objections that the rate constituted a penalty).

It is not necessary to consider whether default interest accrued prior to the date of the foreclosure action (or of a legal demand that preceded the foreclosure case), as Dominion's witness (Mr. Rinzler) testified at trial that Dominion was not seeking default interest for earlier periods.  The record does not include any evidence of a pre-foreclosure demand, and so the Court will award default interest only from the date the foreclosure case was filed.  The evidence (and the official docket) shows that the foreclosure case was filed on August 29, 2012.

## II.    <u>Other Loans</u>

The parties agree that Haimil depleted the reserve under the 2004 Note but that Dominion continued to lend money to Haimil.  However, they disagree over the terms.

Dominion contends that it made an oral agreement with Haimil under which Dominion agreed to lend additional amounts to finish the project, and that the additional loans would be made on the same terms as those set forth in the 2004 Note.  Dominion further contends that in March 2008 the parties executed a promissory note in the amount of $4.0 million that was

10

backdated to November 15, 2006 (the "**2006 Note**") and that was intended to cover the additional amounts that Dominion advanced. The parties also executed a mortgage with respect to the 2006 Note (the "**2006 Mortgage**"). The 2006 Mortgage was never filed and the parties agree that any obligations owed under the 2006 Note must be treated as unsecured obligations in Haimil's bankruptcy case. *See* 11 U.S.C. § 544.

Haimil admits that additional loans were made, but it denies that there was any oral agreement to pay interest on those additional loans. Haimil admits that it executed the 2006 Note and the 2006 Mortgage, but it argues that Dominion should not be allowed to collect interest thereunder because Dominion allegedly committed various wrongs in its dealings with Haimil. (Those affirmative defenses are discussed in Part VI, below.) Haimil's calculations of the amounts owed therefore treat all advances above the balance of the 2004 Note as having been made without interest cost to Haimil, with the exception of real estate tax advances, as to which Haimil has accrued interest at a rate of 12%.

The Court has considered the credibility of the witnesses (Mr. Rinzler for Dominion and Mr. Haimovich for Haimil). The Court finds that the parties did in fact agree that Dominion would make additional loans to Haimil on the same terms as those set forth in the 2004 Note and 2004 Mortgage in order to complete construction and the condominium conversion and to fund real estate tax payments. Haimil's contention that no interest charge was discussed or agreed upon is not credible and is rejected.

Unfortunately, the parties' sloppiness in documenting their agreements created another set of issues that the Court must resolve.

A.     **The Backdating of the 2006 Note**

The parties agree that the 2006 Note and the 2006 Mortgage were backdated.  Haimil has contended generally that Dominion acted wrongfully by back-dating the documents.  However, the Court finds that Haimil's representative (Mr. Haimovich) knew that the 2006 Note and the 2006 Mortgage were being backdated when they were executed, and he executed them (after the parties made other handwritten changes) with the intent that they would have effect in accordance with their terms.  Haimil was not wronged in any way by any alleged misconduct in connection with the backdating of the 2006 Note and the 2006 Mortgage, and the backdating does not constitute any reason to disregard their agreed terms.  (Although the 2006 Mortgage was not filed and therefore did not convey a perfected mortgage lien, its contractual terms still are effective as between the parties.)

B.     **Interest Rate**

The 2006 Note provides for the accrual of interest at a rate equal to the greater of 12% per annum or five percent above the prime rate as announced by Citibank N.A. from time to time, in each case calculated on a 360-day year basis based on actual days elapsed.  As noted above, the testimony at trial (which the Court finds credible) is that the parties agreed that Dominion would make additional loans on the same terms as those that governed the 2004 Note, including the 12% interest rate.  This raises a possible disparity between the 2006 Note (depending on what Citibank's prime rate was) and the parties' oral agreement.  If there is such a disparity, the Court will also need to determine whether the 2006 Note was intended to amend the prior oral agreement, or (if not) whether some advances were made pursuant to the oral agreement and others were made pursuant to the 2006 Note.

12

However, the parties offered no evidence as to Citibank's prime rate, and Dominion has not asked for an award of interest at any rate other than 12%, except for the period when a higher default rate of interest might be applicable.  Any claim to a higher interest rate (based on Citibank's prime rate) has been waived, with the result that there is no inconsistency between the interest rates to which the parties orally agreed and the interest rate set forth in the 2006 Note.

### C.    Amounts Subject to Interest Accruals

The parties' oral agreement was that Dominion would lend additional amounts and that Haimil would pay interest, but there was no discussion of an additional "reserve" that would be established and no discussion or agreement that interest would be paid on any amount other than the actual additional loans that were made.  When the 2006 Note was executed, the provision stating that Haimil would pay interest in a specified monthly amount was crossed out and a handwritten provision was inserted stating that "[i]nterest shall accrue on all amounts outstanding" with a final payment due on November 30, 2007.  Accordingly, interest on Dominion's unsecured loans accrued only based on the unpaid balances of those loans.

### D.    Funding or Accrual of Interest under the 2004 Note

In its summary, Dominion treated additional interest accruals under the 2004 Note (after the reserve had been depleted) as though they had been funded by additional unsecured loans made by Dominion.  Dominion acknowledged at trial that this had the effect of compounding the interest accruals (*i.e.*, instead of accruing simple interest on the secured claim, Dominion treated each monthly interest payment as an additional principal amount loaned by Dominion on an unsecured basis, which itself thereafter accrued interest).

The Court finds after considering the evidence (including the testimony by Mr. Rinzler and Mr. Haimovich) that the parties did not have a specific agreement that additional interest

accruals under the 2004 Note would be treated as though they had been funded by additional

loans from Dominion.  The parties reached no such oral agreement, and the 2006 Note and 2006

Mortgage did not indicate any expectation that sums would be loaned thereunder to pay accrued

interest on the 2004 Note.  The Court therefore finds that interest owed with respect to the 2004

Note continued to accrue at an agreed simple interest rate of 12% after the due date of the 2004

Note and through the date on which the foreclosure action was filed (rather than being paid

through additional loans made by Dominion) and that the continued interest accruals under the

2004 Note were secured by the 2004 Mortgage.

### E.    Interest Accruals on Unsecured Obligations

Dominion submitted calculations that also proposed to compound the interest on the

unsecured loans that it made; in effect, Dominion treated each interest accrual on the unsecured

loans as having been "loaned" to Haimil for payment, thereby increasing the outstanding

principal.  The Court finds that the parties did not agree to this approach or to the application of a

compound interest rate.  The 2006 Note calls for the payment of 12% interest per annum and

provides for no compounding.  The Court also finds that there was no discussion of a compound

interest rate when the parties agreed to the terms on which Dominion would make additional

loans after the reserve under the 2004 Note was exhausted.  Interest accrued at simple interest

rates on the unsecured obligations.

### F.    Real Estate Taxes Paid After the 2004 Note Reserve Was Exhausted

Once the reserve was exhausted, the 2004 Note and the 2004 Mortgage still permitted

Dominion to pay real estate taxes to the extent that Haimil did not do so.  The 2004 Mortgage

provides that interest will accrue at the rate of 2% per month on any such advances.  *See* 2004

Mortgage, ¶¶ 6, 27.  However, Dominion has proposed to treat real estate taxes (after the reserve

was exhausted) as amounts that Dominion loaned to Haimil on an unsecured basis at 12%

interest.  Haimil has proposed this same treatment for all real estate tax advances.

The Court has already determined that real estate tax payments were made from the

reserved amounts under the 2004 Note until that reserve was exhausted.  The terms of the 2004

Mortgage, and New York law, would have permitted Dominion to treat additional tax payments

as secured obligations made pursuant to the terms of the 2004 Note and the 2004 Mortgage,

bearing an interest rate of 2% per month until paid.  It is typical that a note and mortgage will

provide that the lender may pay real estate taxes if the borrower does not do so, in order to

protect the lender from senior tax liens, and such tax advances are secured by the mortgage.  *See*

*Citibank, N.A. v. Nyland (CF8) Ltd.*, 878 F.2d 620, 626 (2d Cir. 1989) (citing N.Y. Real Prop.

Law § 254(6) (McKinney 1989)); *Marine Midland Bank, N.A. v. Harringan Enterprises, Inc.*,

500 N.Y. S. 2d 408 (2d Dep't 1986).  However, given the fact that both parties have treated the

real estate tax advances (after the reserve under the 2004 Note was used up) as having been

funded by unsecured loans, the Court will accept that approach.

### G.    Advances Made Before November 15, 2006

The parties do not agree as to just when the "reserve" under the 2004 Note was depleted

and when Dominion began lending other sums to Haimil, but they agree that this occurred no

later than January 2006.  The 2006 Note was signed in March 2008 but backdated to November

15, 2006, leaving open the question of whether advances made prior to that date are governed by

the 2006 Note and, if so, whether there is any difference between the terms of the 2006 Note and

the terms governing such other advances.  However, the Court finds that there is no difference

between the terms of the parties' oral agreement and the terms of the 2006 Note and the 2006

Mortgage as to any points that affect the issues being decided by the Court.  It is therefore not

15

necessary to consider which (if any) advances were made under the 2006 Note and which might
have been made pursuant to prior oral agreements.

### H.    Default Interest on Unsecured Obligations

The Court has found that the parties agreed that additional loans would be made on the
same terms as the 2004 Note and 2004 Mortgage; that includes the parties' prior agreements as
to default interest.  In addition, the 2006 Note and 2006 Mortgage contain the same provisions
for the payment of default interest as are set forth in the 2004 Note and the 2004 Mortgage,
including the payment of default interest at the rate of 2% per month from and after the date of
filing of a lawsuit to collect the outstanding debts.  Accordingly, interest on the unsecured
obligations accrued at the rate of 12%, and at the default rate of 2% per month on any amounts
that remained unpaid from and after the date on which Dominion filed its state court action.

### III.    Dates and Amounts of Loans Made by Dominion

Although the Court repeatedly urged the parties to reach agreement on as many issues as
possible, the parties' summaries nevertheless continue to differ as to the dates and amounts of
advances made by Dominion.

### A.    Principal Advances

The Court finds that principal advances were made in the amounts and on the dates set
forth in **Exhibit A** to this Opinion.  The Court has included comments in Exhibit A that explains
the Court's finding as to each item.

The Court notes that the exhibits submitted by the parties included two separate checks
(checks 6476 and 6489) dated November 9 and November 10, 2007, each in the amount of
$175,000 and payable to 15 Avenue B Corp.  However, the parties' summaries only list one
advance on November 9, 2007 in the amount of $175,000.  The record does not disclose whether

16

the omission is deliberate or due to mistake. This item is excluded given Dominion's failure to pursue it.

**B.**    **Real Estate Tax Payments**

The Court finds that real estate tax payments were advanced on the dates and in the amounts set forth in **Exhibit B** to this Opinion. Exhibit B includes comments that explain the Court's findings. In addition to those comments, three other points require explanation.

First, Haimil's summary lists three real estate tax payments for 2003-04 with a payment date of 12/31/04; they are not included in the Dominion summary. The payments listed by Haimil match three payments shown in Exhibit 26 that were made in 2003 and 2004. However, these tax payments pre-date the execution of the 2004 Note. No testimony was offered as to why they were not already accounted for in the December 2004 closing and in the calculation of the previously-owed amounts that were being funded by the 2004 Note. Haimil's forensic accountant mentioned these payments, but did not explain why they were included in Haimil's summary and why they were not already covered in the calculation of the outstanding balance that was funded by the 2004 Note. No other witness mentioned these amounts.

It is peculiar that the debtor (Haimil) would list debts that the lender (Dominion) does not claim. Ultimately, Dominion had the burden of proof as to the outstanding debt, and in the absence of further evidence or explanation the Court has excluded these amounts from Exhibit B.

Second, Haimil's summary shows a payment of real estate taxes in the amount of $8,132.58 on January 4, 2005, but that payment also does not appear in Dominion's summary. This payment is confirmed in Trial Exhibit 26 but the payment date listed in that exhibit is December 23, 2004. The Court notes that Trial Exhibit E shows that funds were escrowed at the closing on December 22, 2004 to pay real estate taxes and these were accounted for as part of the

payoff of the prior loans (and are included in the agreed amounts that were advanced as of

December 22, 2004).  Dominion had the burden of proof as to the outstanding debts; in the

absence of further evidence that the amount was not covered by the closing adjustments, and in

light of Dominion's failure to include this amount in its summary, this item has been excluded.

Third, Dominion alleges in its summary that it made a real estate tax payment of

$23,237.11 on June 30, 2008.  This item does not appear in the Haimil summary.  Dominion

offered some internal records as to this item but it offered no evidence of a payment made to the

taxing authorities on this date or in this amount, and so this item has been excluded.

## IV.    Amounts and Dates of Repayments

The parties agree that some repayments were made as condominium sales occurred.

However, the parties' summaries differ slightly as to the dates and amounts of the repayments.

The Court finds that repayments were made in the amounts and on the dates listed in **Exhibit C**

to this Opinion.  Exhibit C includes comments that explain the Court's findings.

## V.    Application of Repayments

The parties disagree as to how repayments should be applied.  Haimil argues (without

citing any legal authorities) that repayments should first be applied against secured loans;

Dominion argues (also without citing any legal authorities) that they should first be applied

against unsecured debts.  The manner in which the payments are applied has an effect on

whether any amounts owed by Haimil to Dominion will be treated as secured or unsecured

claims, which in turn could affect the extent to which Dominion can collect interest that accrued

after the date of Haimil's bankruptcy filing.  *See* 11 U.S.C. §§ 502(b)(2), 506(b).

The general rule under New York law regarding the application of repayments by a

debtor who owes two or more debts to the same creditor is that the debtor may specify to which

debt the repayment should be applied; absent such a specification, the creditor may make the

application as she chooses. *See e.g.*, *Smith v. Rothman*, 157 N.Y.S.2d 676 (Mun. Ct. 1956),

*aff'd*, 175 N.Y.S.2d 956 (1st Dep't 1958), *aff'd*, 159 N.E.2d 679 (N.Y. 1959). However, when

neither party has specified the debt to which a repayment is to be applied, the court will make the

application in such a way as to promote the ends of justice. *Foss v. Riordan*, 84 N.Y.S.2d 224

(Sup. Ct. 1947), *aff'd*, 79 N.Y.S.2d 515 (2d Dep't 1948); *Sanford v. Van Arsdall*, 6 N.Y.S. 494

(Sup. Ct. 1889).

There are several competing theories as to how a court should make an equitable

application of repayments when the issue is left to the court. One familiar statement in the New

York cases — known as the rule of Clayton's Case — is that "'successive payments and credits'

are to be appropriated 'in discharge of the items of debt antecedently due in the order of time in

which they stand in the account,' the first payments out extinguishing the first payments in."

*Foss*, 84 N.Y.S.2d at 233 (quoting *Carson v. Federal Reserve Bank*, 172 N.E. 475, 480 (N.Y.

1930)). Some courts, however, have treated this rule of thumb as being primarily applicable

when all of the debts are of the same character, and have varied the rule when the outstanding

obligations include both secured and unsecured debts. *See Bacon v. Dollar S.S. Lines*, 290 F.

964, 966 (E.D.N.Y. 1923). In these cases, it has been said that it may be equitable to first apply

the payments to the unsecured debt and then to the secured debt. *See, e.g.*, *The Portchester*, 56

F.2d 579, 580 (2d Cir. 1932); *Bacon*, 290 F. at 966; *see also Field v. Holland*, 10 U.S. 8 (1810)

("It being equitable that the whole debt should be paid, it cannot be inequitable to extinguish first

those debts for which the security is most precarious."); Restatement (Second) of Contracts

§ 260; *but see Foss*, 84 N.Y.S.2d at 235 (applying the rule of Clayton's Case where one running

ledger was kept that included both secured and unsecured debts.)

Ultimately, the prevailing view is that there is no hard-and-fast New York rule dictating the manner in which payments should be applied where the parties' agreements and conduct do not provide an answer. In *Carson v. Federal Reserve Bank*, Justice Cardozo explained:

> We have no thought to suggest that this or any other formula as to the application of payments to the items of an account is of such inflexible validity as to admit of no exceptions. Whatever rule is framed will be subordinated to the broader principle that an application, usually appropriate, may be varied by the court when variance is necessary to promote the ends of justice.

*Carson*, 172 N.E. at 480.

In this case, Haimil did not specify that payments were to be applied in any particular way. Haimil also kept no records indicating its belief that payments had been applied in any particular way. Dominion kept one running ledger that showed "aggregate" figures and that did not show the application of repayments to one debt as opposed to another. Mr. Rinzler testified that he and Mr. Haimovich orally agreed that the 2006 Mortgage would not be recorded and that the unsecured debts would be repaid first, but Mr. Haimovich denied that such a conversation occurred, and the Court finds that the parties did not reach a specific agreement on this point.

The only contemporaneous evidence provided to the Court as to how the parties might have believed the payments were being applied is in the form of an excerpt from the condominium offering plan that Haimil's representatives prepared and filed. That offering plan listed an amount that was still owed to Dominion, and described the entire amount as a secured claim. *See* Trial Ex. MM. If at that time the parties understood that only the 2004 Note was secured (and that other debts were not), then this could be evidence that the parties understood that prior repayments had been applied first to the unsecured debts. However, it is not clear in context whether this is what the parties thought, or whether they regarded all of the obligations

as "secured" at the time (the failure to perfect the 2006 Mortgage becoming an issue only after the bankruptcy filing occurred).

At trial, Haimil relied on a spreadsheet that listed various amounts that Dominion had borrowed from another lender, some of which borrowings were secured by a collateral assignment by Dominion to that lender of Dominion's rights under the 2004 Note and the 2004 Mortgage. The spreadsheet included the notation "paid off" with respect to the loan to which the collateral assignment related. Haimil argued that this meant that the proceeds of condominium sales had been applied to the 2004 Note and that Haimil's obligations under that note had been fully paid. However, Mr. Rinzler testified credibly that the notation simply meant that Dominion had paid off its own loan – not that Haimil had satisfied Haimil's obligations. Haimil's contrary arguments are rejected.

Haimil also cited to a statement in the unfiled 2006 Mortgage that states that the 2006 Mortgage was to be "subordinate" to the 2004 Mortgage, and argued that this constituted an agreement that any repayments would be applied first to the 2004 Note and only then to obligations under the 2006 Note. However, as this Court held in denying Haimil's motion for summary judgment, the subordination language does not have the meaning that Haimil suggests. The subordination language has to do with the superior *rights* afforded to the lender under the 2004 Note and the 2004 Mortgage. It is plain that a holder of the 2004 Note would have had the legal right to insist that proceeds from collateral sales be used to repay sums owed under the secured 2004 Note before unsecured debts under the 2006 Note were paid. However, there is nothing in the terms of various notes and mortgages, or in the parties' discussions, that *required* the holder of the 2004 Note (Dominion) to exercise that superior right and to apply payments to the secured obligations rather than the unsecured debts, particularly when Dominion owned both

21

obligations.  Secured creditors can, and sometimes do, allow more junior obligations to be paid, and there was nothing about the subordination language that required Dominion to apply payments in an order that weakened its remaining liens and enforcement rights, or that predetermined how proceeds would actually be applied.

The evidence also showed that Dominion waived its liens on individual condominium units as they were sold; Haimil argued that this somehow means that the proceeds of the sales must have been applied to the secured debts.  However, a lender must always waive its lien on a condominium unit in order for the unit to be sold, and that is true no matter how the proceeds of the sale are to be applied.  Lenders can waive liens for any number of reasons (including if and when they agree to allow other obligations to be paid), and the lien waivers by themselves do not indicate that the parties had any specific understanding as to how repayments were to be applied.

The Court finds, after reviewing the evidence, that the parties did not specify the manner in which the payments would be applied.  As a result the application of the payments is to be decided by the Court based on the equities of the case.  The Court further holds that the equities of this particular case call for the application of payments first to the "unsecured" debts and only then to the secured debts.  It would enrich Haimil unjustly, and would penalize Dominion unduly, to apply the repayments first to the secured debts.

Haimil has acknowledged that the primary motivation for its June 2014 bankruptcy filing was the entry of an order by the state court in May 2014, approving the appointment of a receiver in Dominion's foreclosure case.  *See* Haimil's First Status Report Concerning the Administration of its Chapter 11 Case, dated January 21, 2015  [ECF No. 39.]  That order threatened Haimil's continued possession and control of the Property.  As a result of the bankruptcy filing Dominion's foreclosure case was stayed (it was then removed by Haimil to this Court), the

22

reason

appointment of a receiver was evaded, and Haimil and its principal (Mr. Haimovich) remained in

control of the Property and also of Haimil's business affairs.[1]  It also appears from the docket

that in the ensuing 20 months Haimil has not filed the Schedules and Statements that the

Bankruptcy Code and the Federal Rules of Bankruptcy Procedure require.  Similarly, no plan of

reorganization has been proposed.  There has been no indication of any effort by Haimil to finish

and sell the remaining units, or to make arrangements to reorganize and to satisfy Haimil's debts.

With the exception of Dominion, Haimil identified only a few potential creditors in the list of 20

largest creditors that it filed on June 12, 2014 [ECF No. 4], and it has identified no reason for the

commencement of a bankruptcy case other than the desire to suspend the state court foreclosure

case and the receiver appointment.  On the whole it is quite apparent that the bankruptcy case

exists mainly for the purpose of obstructing Dominion's enforcement of its rights and for

maintaining Haimil's control over the property in the interim.  It would be inequitable to reward

Haimil by applying payments first to the secured debts, with the result that Dominion's right to

collect additional interest after June 2014 might be limited by section 502(b)(2) of the

Bankruptcy Code.

It would be particularly unfair to impose such a result given the many accommodations

that Dominion has already provided to Haimil.  Dominion agreed to lend additional amounts

after the 2004 Note came due; it waived claims to default interest that might have been owed

prior to the date on which foreclosure proceedings were commenced; and it waived claims for

Additional Interest under the 2004 Note (which would have been secured claims of several

hundred thousand dollars based on the condominium sales that have already occurred, with more

payable in the future based on the sale of the units that Haimil still owns).  Haimil has accused

---

[1]    The parties have previously informed the Court that Mr. Haimovich has continued to occupy
the unsold and apparently still-unfinished penthouse unit at the Property.

Dominion of unfair or unconscionable conduct, but as explained further below the Court finds no merit in any of these accusations.  To the contrary: the evidence shows that Dominion was a cooperative and supportive lender.  It is Haimil (not Dominion) whose behavior has been questionable.  Haimil has refused to honor legitimate debts, and has made arguments about the parties' agreements (for example, that the unsecured loans should be treated as "interest-free") that are self-serving and wholly without merit.

The Court therefore holds that repayments should be applied first to the unsecured debts and only then to the secured obligations.  As between interest and principal on each obligation, the Court will apply the repayments first to interest and then to principal, consistent with New York law.  *Shepard v. City of New York*, 110 N.E. 435 (N.Y. 1915).

## VI.    Haimil's Affirmative Defenses and Counterclaims

Haimil has asserted various other affirmative defenses and counterclaims against Dominion, all of which the Court has considered and concludes are without merit.

### A.    Statute of Limitations

In the Joint Pretrial Order, Haimil asserted that the debt owed to Dominion is barred by the statute of limitations set forth in CPLR § 213(4).  Although the statute of limitations defense was mentioned in the Joint Pretrial Order, the defense was not briefed.  Nor was the defense ever mentioned at trial, during argument, or in Haimil's post-trial submissions to this Court.  The defense therefore was abandoned.

Furthermore, the evidence showed clearly that there is no merit to the statute of limitations defense.  The evidence shows that partial payments were made by Haimil in 2008-2010.  The parties disagree as to how the payments should be applied, but given the amounts of the payments it is clear (no matter how they are applied) that some payments were made with

24

respect to both the 2004 Note and the unsecured obligations. The partial payments made by Haimil to Dominion in 2008-2010 effectively reinstated the statute of limitations such that the state court litigation that Dominion filed in August 2012 was plainly within the limitations period. *See Chase v. Houghton*, 838 N.Y.S.2d 260, 261–62 (3d Dep't 2007).

### B.    Unclean Hands and Fraud

Haimil also argued that Dominion should be barred from recovery under the equitable doctrine of unclean hands because of the backdating of the 2006 Note and 2006 Mortgage and because of an allegedly forged mortgage note that Dominion once attached to papers filed in the state court. Haimil, however, failed to offer any evidence at all that it was prejudiced by any of Dominion's allegedly wrongful conduct, a necessary element of the unclean hands defense. *See Nat'l Distillers & Chem. Corp. v. Seyopp Corp.*, 214 N.E.2d 361, 362 (N.Y. 1966). In addition, the evidence does not support Haimil's accusations.

Haimil's allegations regarding the backdating of the 2006 Note and 2006 Mortgage are insufficient to rise to the level of "immoral, unconscionable conduct" necessary to invoke the unclean hands doctrine. *Id*. As explained above, the Court finds that Haimil was aware of the backdating of these instruments, and as such, there was no wrongdoing, let alone "immoral, unconscionable conduct."

Haimil's allegations regarding the allegedly forged note relate to proceedings in the New York State Court that preceded the removal of the foreclosure action to this Court. Dominion filed papers that attached a $1 million note, only to have Haimil claim that it was forged. Dominion promptly withdrew any reliance on that note and has never since made any reference to it. The only time the note has even been mentioned in this Court has been when Haimil has raised it. The Court finds that Mr. Rinzler's testimony about the circumstances under which he

found a copy of the $1 million note, and then later submitted it to the state court, to be credible, and finds that no "immoral, unconscionable conduct" occurred. Furthermore, Haimil has not alleged (let alone proved) that it suffered any prejudice from this brief incident, which would have been lost to history and which would have been irrelevant at trial if Haimil had not repeatedly referred to it.

For similar reasons there is no merit to Haimil's contentions that Dominion has committed a fraud on the Court. The backdating of the 2006 Note and the 2006 Mortgage, and the brief reliance (in the state court) on the allegedly forged $1 million note, did not constitute fraud, and in any event they did not prejudice Haimil or affect the proceedings. *See Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1325 (2d Cir. 1995) (fraud on the court "is limited to fraud which seriously affects the integrity of the normal process of adjudication").

### C.    Allegedly Deficient Proof of Claim Documentation

In its post-trial submissions to the Court, Haimil also contends that Dominion's failure to attach supporting documentation to its original proof of claim should result in the loss of the claim's *prima facie* validity or complete disallowance of the claim. This argument is absurd given that Dominion's proof of claim was filed after it had already filed the present adversary proceeding, which included ample documentation regarding the claim. Haimil also cannot seriously contend it was prejudiced, given that it was perfectly aware of its business dealings with Dominion and had ample time to take discovery prior to trial.

### D.    Standing

Haimil includes in its Amended Answer to the Complaint affirmative defenses asserting that Dominion lacks standing to bring this action (affirmative defense #7) and that Dominion is "precluded from maintaining this action to the extent that it is not the proper holder of the loan

26

documents underlying the alleged debt obligations asserted in the Complaint" (affirmative defense #9).  The defenses appear to be based upon the fact that Dominion assigned the 2004 Mortgage to Israel Discount Bank of New York ("**IDB**") on August 1, 2007 and then IDB reassigned the 2004 Mortgage back to Dominion on July 31, 2012.  The defenses were not pursued at trial or in post-trial submissions and therefore were abandoned.  The defenses also are without merit, because the assignment to IDB was clearly labeled as one for collateral purposes, made to secure a loan owed by Dominion to IDB.  *See* Trial Ex. 21.  There was no outright assignment (merely a collateral assignment) and Dominion at all times was the owner of the relevant obligations and liens.

Furthermore, the underlying state foreclosure action (from which this adversary proceeding stems) was not filed until after IDB had terminated the collateral assignments.  As such, Dominion has adequate standing to assert its claims against Haimil and is the proper holder of the loan documents at issue here.

### E.    Breach of Contract and Unjust Enrichment

Haimil's counterclaims for breach of contract (also affirmative defense #8) and unjust enrichment also fail.  Haimil never put forth any argument or evidence regarding what provision of which agreement Dominion purportedly breached and what conduct constituted such a breach. To the extent the parties disagreed over the terms of the loans and the amounts owed, those disagreements are resolved in the manner set forth above, and no further discussion of them is needed.

As to the unjust enrichment claim, Haimil argued in its Amended Answer to the Complaint that: "Dominion accepted and retained all payments made to it by Haimil as well as the proceeds of the sales of the Units . . . despite having no legal or contract right to do so.  As a

result, Dominion derived a substantial and improper benefit from such amounts on account of which Haimil has not received any reciprocal value or benefit." *See* Am. Answer, ECF No. 23, ¶¶ 60–61. The defense is therefore premised on the contention that Haimil did not actually owe money to Dominion at the times the condominium units were sold. Haimil's own summaries belie that contention, however. Dominion had a right to keep payments Haimil paid to it as repayment for any of the several loans extended by Dominion to Haimil and it did not breach contracts, or unjustly enrich itself, by doing so.

### F.    Attorney Escrow Account

Dominion sent checks to an account maintained by Mr. Rinzler's father that was described as an attorney's escrow account, and disbursements were made from that account to Haimil (and back to Dominion when interest was paid). Haimil contends that the attorney escrow account was not maintained in accordance with applicable professional rules. However, neither Dominion nor Mr. Rinzler's father was acting as counsel to Haimil, and neither were holding funds for a client in an attorney-client capacity. Mr. Rinzler testified credibly that although the account was labeled as an attorney escrow account it was not actually used in connection with legal work or for the segregation of client funds. It is a mystery why an account labeled as an attorney's escrow account was used by Dominion and Mr. Rinzler, but there was no attorney-client relationship Haimil, no receipt by an attorney of a client's funds, and therefore no actionable breach of rules that govern an attorney's handling of client funds.

### G.    Other Alleged Misconduct

In its post-trial submissions Haimil contends that Dominion should be stripped of its rights because (among other reasons) Dominion allegedly charged the wrong rate of interest, wrongly charged compounded interest, kept records that were not clear, provided Haimil with

"confusing" statements of account, and otherwise made mistakes from time to time in calculating the amounts that were owed. If there is anything that was clear at trial it was that the parties did not keep perfect records of their dealings. However, it is peculiar for Haimil to criticize the sufficiency of Dominion's records, and to try to raise these to the level of inequitable or unconscionable conduct, when Haimil itself kept few (if any) records at all.

The testimony at trial showed that Dominion mistakenly accrued interest in its own records at a 12.5%, but it also showed that Dominion promptly agreed to correct that error when Haimil's representative called it to Dominion's attention. Haimil offered no evidence that the prior error had affected Haimil in any way. Similarly, Dominion's calculations of the outstanding debts have not been consistent or fully accurate – but then again, neither have Haimil's. The imperfections in the parties' record-keeping and calculations left many issues for the Court to resolve, but they did not constitute unfair, inequitable or unconscionable conduct that prejudiced either party or that should alter the parties' legal rights.

## H.    Other Defenses

Haimil's remaining defenses asserted in its Amended Answer to the Complaint include failure to set forth a cause of action (#1), failure to comply with applicable Banking and/or Real Property Actions and Proceedings Law (#2), inadequate service of demand (#3), amounts subject to a bona fide dispute (#5), failure to mitigate damages (#6), failure of conditions of the parties' agreements (#10), culpable conduct and contributory negligence (#11), accord and satisfaction (#12), estoppel (#13), laches (#14), mistake (#15), and waiver (#16). The defenses in this laundry list were not mentioned in any further pleadings, including the Joint Pretrial Order or at trial, and thus were abandoned. The Court also found no evidence at trial that provided any support for these defenses.

## VII.   Remaining Amounts Owed

**Exhibits D** and **E** reflect the many rulings set forth above and set forth the Court's calculation of the amounts currently owed.  The Court determines that Haimil is indebted to Dominion in the amount of $2,608,526.05 as of February 16, 2016 (representing a principal balance of $1,225,427.21 and accrued interest of $1,383,098.84).  The debts owed to Dominion are secured obligations to the extent that the value of the Property is sufficient to cover them. *See* 11 U.S.C. § 506(b).  The parties are directed to appear at a conference on March 1, 2016 at 10:00 a.m. to discuss the additional relief sought in the adversary proceeding (an order permitting Dominion to foreclose on the property) and how the parties wish to proceed.

Dated: New York, NY
      February 16, 2016


                      **/s/Michael E. Wiles**
                      United States Bankruptcy Judge

**Exhibit A**

**Principal Advances**

| Date | Amount | Comment |
|------|--------|---------|
| 12/22/2004 | $1,966,994.69 | Parties' summaries list different dates; date used here is based on the note and mortgage (Exhibit C) and list of disbursements at closing (Exhibit E). |
| 12/23/2004 | $75,000.00 | Parties' summaries agree; confirmed by check 4414 (Exhibit F) |
| 1/18/2005 | $236,632.59 | Haimil summary lists date as 12/22, Dominion summary lists date of 12/23, but check is dated 1/18/05 (Exhibit G) and that date is used here. |
| 2/9/2005 | $91,179.07 | Parties' summaries agree; confirmed by check 4432 (Exhibit PP) |
| 3/28/2005 | $42,720.57 | Parties' summaries listed 3/29 as the date but check 5086 (Exhibit PP) is dated 3/28, and that date is used. |
| 4/13/2005 | $67,000.00 | Parties' summaries agree; confirmed by check 5097 (Exhibit PP) |
| 5/12/2005 | $50,000.00 | Dominion's summary shows one advance of $107,500 on May 12. Checks 5141 and 5182 (Exhibit PP) show that two advances were made on May 12 ($50,000) and June 1 ($57,000), as shown in the Haimil summary. This exhibit uses the dates and amounts shown on the checks. |
| 6/1/2005 | $57,500.00 | |
| 6/30/2005 | $18,000.00 | Not shown on Haimil spreadsheet; check 5269 in Exhibit PP is dated 7/6 and is in the amount of $18,000. This advance is supported by the evidence and is accepted in the amount of $18,000. |
| 6/30/2005 | $115,000.00 | Parties' summaries agree; confirmed by check 5266 (Exhibit PP) |
| 8/16/2005 | $50,000.00 | Parties' summaries differ slightly due to rounding; check 5316 (Exhibit PP) confirms amount |
| 9/7/2005 | $100,000.00 | Parties' summaries differ slightly due to rounding; check 5376 (Exhibit PP) confirms amount |
| 10/12/2005 | $100,000.00 | Parties' summaries differ slightly due to rounding; check 5469 (Exhibit PP) confirms amount |
| 11/10/2005 | $120,000.00 | Parties' summaries agree; confirmed by checks 10453 and 10454 (Exhibit PP) |
| 1/6/2006 | $127,000.00 | Parties' summaries agree; confirmed by check 5583 (Exhibit PP) |
| 2/8/2006 | $125,000.00 | Parties' summaries agree; confirmed by check 5645 (Exhibit PP) |

| Date | Amount | Comment |
|---|---|---|
| 3/16/2006 | $125,000.00 | Parties' summaries agree; confirmed by check 5697 (Exhibit PP) |
| 5/5/2006 | $130,000.00 | Parties' summaries agree; confirmed by check 5747 (Exhibit PP) |
| 6/13/2006 | $125,000.00 | Parties' summaries differ slightly due to rounding; check 5807 (Exhibit PP) confirms amount |
| 7/25/2006 | $175,000.00 | Parties' summaries differ slightly due to rounding; check 5912 (Exhibit PP) confirms amount |
| 9/7/2006 | $175,000.00 | Dominion's summary lists date as 9/11/06; two checks (5974 for $20K and 5975 for $150 K) are dated 9/7. |
| 10/17/2006 | $175,000.00 | Dominion summary lists date as 10/18 and contains rounded numbers; checks 6019 and 6020 (Exhibit PP) confirm $175,000 advance on 10/17 |
| 11/17/2006 | $175,000.00 | Dominion summary lists date as 11/20; checks 6055 and 6056 (Exhibit PP), totaling $175,000, confirm date was 11/17/06 |
| 1/4/2007 | $175,000.00 | Parties' summaries agree; confirmed by check 6122 (Exhibit PP) |
| 1/26/2007 | $175,000.00 | Parties' summaries agree; confirmed by check 6131 (Exhibit PP) |
| 3/14/2007 | $175,000.00 | Dominion summary lists date as 3/15; check 6189 (Exhibit PP) shows correct date is 3/14 |
| 4/25/2007 | $175,000.00 | Dominion summary lists date as 4/26; check 6229 (exhibit PP) shows payment was on 4/25 |
| 5/30/2007 | $175,000.00 | Parties' summaries agree; confirmed by check 6281 (Exhibit PP) |
| 7/12/2007 | $175,000.00 | Parties' summaries differ slightly due to rounding; check 6328 (Exhibit PP) confirms amount |
| 8/24/2007 | $175,000.00 | Parties' summaries agree; confirmed by check 6412 (Exhibit PP) |
| 10/2/2007 | $175,000.00 | Parties' summaries agree; confirmed by check 6448 (Exhibit PP) |
| 11/9/2007 | $175,000.00 | Parties' summaries agree; confirmed by check 6476 (Exhibit PP). |
| 12/20/2007 | $125,000.00 | Parties' summaries differ slightly due to rounding; check 6501 (Exhibit PP) confirms amount |
| 2/15/2008 | $50,000.00 | Parties' summaries agree. |
| 4/4/2008 | $75,000.00 | Parties' summaries agree |
| 6/19/2008 | $75,000.00 | Parties' summaries agree |

**Exhibit B**

**Real Estate Tax Payments/Advances**

| Date | Amount | Comment |
|---|---|---|
| 6/29/2005 | $9,835.28 | Summaries differ as to the date; check 5258 (Exhibit PP) confirms payment on 6/29. |
| 12/15/2005 | $9,406.42 | Dominion's summary lists a payment of $12,999.62 on 1/6/06; check 5581 in that amount is payable to Dominion but that is not evidence of an actual tax payment. Haimil acknowledges payment of $9,406.42 on 1/10/06. Exhibit 26 shows payment of $9406.42 but lists the date as December 15, 2005. The Haimil figure is accepted and the date shown in Exhibit 26 is accepted as the date of payment. |
| 6/30/2006 | $19,236.58 | The parties' summaries differ as to date and amount. Check 5915 (Exhibit PP) is for $20,000 on 7/26 but is payable to Dominion; no check was provided showing a payment to tax authorities. Haimil acknowledges payment of $19,236.58; that figure is verified in Exhibit 26 but with a date of June 30, 2006. The Haimil figure is accepted but the date shown in Exhibit 26 is accepted as the date of payment. |
| 12/20/2006 | $18,185.10 | Both summaries list this payment but there is a discrepancy of $2.32. Check 6124 confirms payment of $18,182.88 to Dominion on 1/4/07 but no check was provided showing payment to taxing authorities. Exhibit 26 shows a tax payment of $18,185.10 on December 20, 2006; that figure and date are accepted. |
| 7/11/2007 | $32,241.38 | The parties' summaries list this payment but the figures differ. Check 6329 for $32,258.01 is payable to Dominion, but no check was offered showing payment to the taxing authorities. The figure admitted by Haimil is accepted. |
| 1/14/2008 | $32,241.38 | The parties' summaries differ as to the date and amount. Haimil's figure matches the payment for July 2007 and is adopted here. |

**Exhibit C**

**<u>Repayments</u>**

| Date | Unit | Amount | Comment |
|------|------|--------|---------|
| 4/1/2008 | Unit 4 | $1,505,154.84 | Joint Pretrial Order ¶ 11(a) confirms the Dominion figure |
| 4/23/2008 | Unit 6 | $1,534,635.27 | Joint Pretrial Order ¶ 11(b) |
| 7/10/2008 | Unit 5 | $1,575,000.00 | Dominion lists the payment date as 7/11; Joint Pretrial Order ¶ 11(c) confirms the July 10 date |
| 7/31/2008 | Unit 2 | $1,873,354.63 | Dominion lists the payment date as 8/1; Joint Pretrial Order ¶ 11(d) confirms the July 31 date. |
| 4/23/2010 | Unit 3 | $1,200,000.00 | Haimil lists the payment date as 4/30, Dominion lists it as 4/28, but the Joint Pretrial Order stipulates a payment date of 4/23. |

**Exhibit D**

**Allocations Against Reserved Funds**

Based on the above rulings, the following table shows the movements of funds out of the

"reserve" under the 2004 Note.  November 10, 2005 is the first date that the funds advanced

exceeded the $3.4 million stated amount of the 2004 Note:

| Date | Activity | Amount | 2004 Note | | | Unsecured |
| | | | Advanced | Reserved | Total Outstanding | Amount |
|---|---|---|---|---|---|---|
| 12/22/2004 | Principal | $1,966,994.69 | $1,966,994.69 | $1,433,005.31 | $3,400,000.00 | |
| 12/23/2004 | Principal | $75,000.00 | $2,041,994.69 | $1,358,005.31 | $3,400,000.00 | |
| 1/18/2005 | Principal | $236,632.59 | $2,278,627.28 | $1,121,372.72 | $3,400,000.00 | |
| 2/1/2005 | Interest | $34,472.22 | $2,313,099.50 | $1,086,900.50 | $3,400,000.00 | |
| 2/9/2005 | Principal | $91,179.07 | $2,404,278.57 | $995,721.43 | $3,400,000.00 | |
| 3/1/2005 | Interest | $34,472.22 | $2,438,750.79 | $961,249.21 | $3,400,000.00 | |
| 3/28/2005 | Principal | $42,720.57 | $2,481,471.36 | $918,528.64 | $3,400,000.00 | |
| 4/1/2005 | Interest | $34,472.22 | $2,515,943.58 | $884,056.42 | $3,400,000.00 | |
| 4/13/2005 | Principal | $67,000.00 | $2,582,943.58 | $817,056.42 | $3,400,000.00 | |
| 5/1/2005 | Interest | $34,472.22 | $2,617,415.80 | $782,584.20 | $3,400,000.00 | |
| 5/12/2005 | Principal | $50,000.00 | $2,667,415.80 | $732,584.20 | $3,400,000.00 | |
| 6/1/2005 | Interest | $34,472.22 | $2,701,888.02 | $698,111.98 | $3,400,000.00 | |
| 6/1/2005 | Principal | $57,500.00 | $2,759,388.02 | $640,611.98 | $3,400,000.00 | |
| 6/29/2005 | RE Taxes | $9,835.28 | $2,769,223.30 | $630,776.70 | $3,400,000.00 | |
| 6/30/2005 | Principal | $18,000.00 | $2,787,223.30 | $612,776.70 | $3,400,000.00 | |
| 6/30/2005 | Principal | $115,000.00 | $2,902,223.30 | $497,776.70 | $3,400,000.00 | |
| 7/1/2005 | Interest | $34,472.22 | $2,936,695.52 | $463,304.48 | $3,400,000.00 | |
| 8/1/2005 | Interest | $34,472.22 | $2,971,167.74 | $428,832.26 | $3,400,000.00 | |
| 8/16/2005 | Principal | $50,000.00 | $3,021,167.74 | $378,832.26 | $3,400,000.00 | |
| 9/1/2005 | Interest | $34,472.22 | $3,055,639.96 | $344,360.04 | $3,400,000.00 | |
| 9/7/2005 | Principal | $100,000.00 | $3,155,639.96 | $244,360.04 | $3,400,000.00 | |
| 10/1/2005 | Interest | $34,472.22 | $3,190,112.18 | $209,887.82 | $3,400,000.00 | |
| 10/12/2005 | Principal | $100,000.00 | $3,290,112.18 | $109,887.82 | $3,400,000.00 | |
| 11/1/2005 | Interest | $34,472.22 | $3,324,584.40 | $75,415.60 | $3,400,000.00 | |
| **11/10/2005** | **Principal** | **$120,000.00** | **$3,400,000.00** | **$0.00** | **$3,400,000.00** | **$44,584.40** |

**Exhibit E**

**Amounts Owed**

This table shows the accrual of interest on outstanding sums, the application of payments that were made and the amount currently owed.  Interest on the 2004 Note is accrued at the specified monthly amount through January 1, 2006; in all other cases the amount of interest that has accrued between different events is accrued using the actual/360 day count convention for the time period that passed between the events.  For each day on which an event occurred (a principal advance, a real estate tax advance or a payment) there are line items that show the additional interest accrued through that date (to bring the interest calculations current), then the adjustment to the outstanding amounts (based on the nature of the event that happened), and then the balances after reflecting the foregoing.  Interest is calculated at the rate of 12% through the date on which the foreclosure case was filed and at 24% thereafter.

| Date | Activity | 2004 Note | | Other | |
|---|---|---|---|---|---|
| | | Principal | Interest | Principal | Interest |
| 11/10/2005 | Balance | $3,400,000.00 | $0.00 | $44,584.40 | $0.00 |
| 12/1/2005 | Interest | | $34,472.22 | | $312.09 |
| | New balances | $3,400,000.00 | $34,472.22 | $44,584.40 | $312.09 |
| 12/15/2005 | Interest | | | | $208.06 |
| | RE Taxes | | | $9,406.42 | |
| | New balances | $3,400,000.00 | $34,472.22 | $53,990.82 | $520.15 |
| 1/1/2006 | Interest | | $34,472.22 | | $305.95 |
| | New balances | $3,400,000.00 | $68,944.44 | $53,990.82 | $826.10 |
| 1/6/2006 | Interest | | $5,666.67 | | $89.98 |
| | Principal | | | $127,000.00 | |
| | New balances | $3,400,000.00 | $74,611.11 | $180,990.82 | $916.08 |
| 2/8/2006 | Interest | | $37,400.00 | | $1,990.90 |
| | Principal | | | $125,000.00 | |
| | New balances | $3,400,000.00 | $112,011.11 | $305,990.82 | $2,906.98 |
| 3/16/2006 | Interest | | $40,800.00 | | $3,671.89 |
| | Principal | | | $125,000.00 | |
| | New balances | $3,400,000.00 | $152,811.11 | $430,990.82 | $6,578.87 |

36

| Date | Activity | 2004 Note | | Other | |
|---|---|---|---|---|---|
| | | Principal | Interest | Principal | Interest |
| | Interest | | $56,666.67 | | $7,183.18 |
| 5/5/2006 | Principal | | | $130,000.00 | |
| | New balances | $3,400,000.00 | $209,477.77 | $560,990.82 | $13,762.05 |
| | Interest | | $44,200.00 | | $7,292.88 |
| 6/13/2006 | Principal | | | $125,000.00 | |
| | New balances | $3,400,000.00 | $253,677.77 | $685,990.82 | $21,054.93 |
| | Interest | | $19,266.67 | | $3,887.28 |
| 6/30/2006 | RE Taxes | | | $19,236.58 | |
| | New balances | $3,400,000.00 | $272,944.44 | $705,227.40 | $24,942.21 |
| | Interest | | $28,333.33 | | $5,876.90 |
| 7/25/2006 | Principal | | | $175,000.00 | |
| | New balances | $3,400,000.00 | $301,277.77 | $880,227.40 | $30,819.11 |
| | Interest | | $49,866.67 | | $12,910.00 |
| 9/7/2006 | Principal | | | $175,000.00 | |
| | New balances | $3,400,000.00 | $351,144.44 | $1,055,227.40 | $43,729.11 |
| | Interest | | $45,333.33 | | $14,069.70 |
| 10/17/2006 | Principal | | | $175,000.00 | |
| | New balances | $3,400,000.00 | $396,477.77 | $1,230,227.40 | $57,798.81 |
| | Interest | | $35,133.33 | | $12,712.35 |
| 11/17/2006 | Principal | | | $175,000.00 | |
| | New balances | $3,400,000.00 | $431,611.11 | $1,405,227.40 | $70,511.16 |
| | Interest | | $37,400.00 | | $15,457.50 |
| 12/20/2006 | RE Taxes | | | $18,185.10 | |
| | New balances | $3,400,000.00 | $469,011.11 | $1,423,412.50 | $85,968.66 |
| | Interest | | $17,000.00 | | $7,117.06 |
| 1/4/2007 | Principal | | | $175,000.00 | |
| | New balances | $3,400,000.00 | $486,011.11 | $1,598,412.50 | $93,085.72 |
| | Interest | | $24,933.33 | | $11,721.69 |
| 1/26/2007 | Principal | | | $175,000.00 | |
| | New balances | $3,400,000.00 | $510,944.44 | $1,773,412.50 | $104,807.42 |
| | Interest | | $53,266.67 | | $27,783.46 |
| 3/14/2007 | Principal | | | $175,000.00 | |
| | New balances | $3,400,000.00 | $564,211.11 | $1,948,412.50 | $132,590.88 |
| | Interest | | $47,600.00 | | $27,277.78 |
| 4/25/2007 | Principal | | | $175,000.00 | |
| | New balances | $3,400,000.00 | $611,811.11 | $2,123,412.50 | $159,868.65 |
| | Interest | | $39,666.67 | | $24,773.15 |
| 5/30/2007 | Principal | | | $175,000.00 | |
| | New balances | $3,400,000.00 | $651,477.77 | $2,298,412.50 | $184,641.80 |

| Date | Activity | 2004 Note Principal | 2004 Note Interest | Other Principal | Other Interest |
|---|---|---|---|---|---|
| 7/11/2007 | Interest | | $47,600.00 | | $32,177.78 |
| | RE Taxes | | | $32,241.38 | |
| | New balances | $3,400,000.00 | $699,077.77 | $2,330,653.88 | $216,819.57 |
| 7/12/2007 | Interest | | $1,133.33 | | $776.88 |
| | Principal | | | $175,000.00 | |
| | New balances | $3,400,000.00 | $700,211.11 | $2,505,653.88 | $217,596.46 |
| 8/24/2007 | Interest | | $48,733.33 | | $35,914.37 |
| | Principal | | | $175,000.00 | |
| | New balances | $3,400,000.00 | $748,944.44 | $2,680,653.88 | $253,510.83 |
| 10/2/2007 | Interest | | $44,200.00 | | $34,848.50 |
| | Principal | | | $175,000.00 | |
| | New balances | $3,400,000.00 | $793,144.44 | $2,855,653.88 | $288,359.33 |
| 11/9/2007 | Interest | | $43,066.67 | | $36,171.62 |
| | Principal | | | $175,000.00 | |
| | New balances | $3,400,000.00 | $836,211.11 | $3,030,653.88 | $324,530.95 |
| 12/20/2007 | Interest | | $46,466.67 | | $41,418.94 |
| | Principal | | | $125,000.00 | |
| | New balances | $3,400,000.00 | $882,677.77 | $3,155,653.88 | $365,949.88 |
| 1/14/2008 | Interest | | $28,333.33 | | $26,297.12 |
| | RE Taxes | | | $32,241.38 | |
| | New balances | $3,400,000.00 | $911,011.11 | $3,187,895.26 | $392,247.00 |
| 2/15/2008 | Interest | | $36,266.67 | | $34,004.22 |
| | Principal | | | $50,000.00 | |
| | New balances | $3,400,000.00 | $947,277.77 | $3,237,895.26 | $426,251.21 |
| 4/1/2008 | Interest accrual | | $52,133.33 | | $49,647.73 |
| | Net before payment | $3,400,000.00 | $999,411.11 | $3,237,895.26 | $475,898.94 |
| | Payment - $1,505,154.84 | | | ($1,029,255.90) | ($475,898.94) |
| | New balances | $3,400,000.00 | $999,411.11 | $2,208,639.36 | $0.00 |
| 4/4/2008 | Interest | | $3,400.00 | | $2,208.64 |
| | Principal | | | $75,000.00 | |
| | New balances | $3,400,000.00 | $1,002,811.11 | $2,283,639.36 | $2,208.64 |
| 4/23/2008 | Interest accrual | | $21,533.33 | | $14,463.05 |
| | Net before payment | $3,400,000.00 | $1,024,344.44 | $2,283,639.36 | $16,671.69 |
| | Payment - $1,534,635.27 | | | ($1,517,963.58) | ($16,671.69) |
| | New balances | $3,400,000.00 | $1,024,344.44 | $765,675.78 | |
| 6/19/2008 | Interest | | $64,600.00 | | $14,547.84 |
| | Principal | | | $75,000.00 | |
| | New balances | $3,400,000.00 | $1,088,944.44 | $840,675.78 | $14,547.84 |

38

| Date | Activity | 2004 Note | | Other | |
|---|---|---|---|---|---|
| | | Principal | Interest | Principal | Interest |
| 7/10/2008 | Interest accrual | | $23,800.00 | | $5,884.73 |
| | Net before payment | $3,400,000.00 | $1,112,744.44 | $840,675.78 | $20,432.57 |
| | Payment - $1,575,000 | | ($713,891.65) | ($840,675.78) | ($20,432.57) |
| | New balances | $3,400,000.00 | $398,852.79 | $0.00 | $0.00 |
| 7/31/2008 | Interest accrual | | $23,800.00 | | |
| | Net before payment | $3,400,000.00 | $422,652.79 | | |
| | Payment - $1,873,354.63 | ($1,450,701.84) | ($422,652.79) | | |
| | New balances | $1,949,298.16 | $0.00 | | |
| 3/2/2010 | Interest | | $376,214.55 | | |
| | Principal | | | $65,000.00 | |
| | New balances | $1,949,298.16 | $376,214.55 | $65,000.00 | $0.00 |
| 4/23/2010 | Interest accrual | | $33,787.83 | | $1,126.67 |
| | Net before payment | $1,949,298.16 | $410,002.38 | $65,000.00 | $1,126.67 |
| | Payment - $1,200,000 | ($723,870.95) | ($410,002.38) | ($65,000.00) | ($1,126.67) |
| | New balances | $1,225,427.21 | | | |
| 8/29/2012 | Interest accrual to foreclosure filing | | $348,838.28 | | |
| 6/11/2014 | Default interest from foreclosure to Petition Date | | $531,835.41 | | |
| 2/16/2016 | Default interest since Petition Date | | $502,425.16 | | |
| | Interest since 6/11/14 | | $1,383,098.84 | | |
| | | | | | |
| | Amount due as of 2/16/16: | | | | |
| | Principal | $1,225,427.21 | | | |
| | Interest | $1,383,098.84 | | | |
| | Total | $2,608,526.05 | | | |

39